## Haller *v.* Pennsylvania R. R., Appellant.

Argued October 9, 1931.   Before Frazer, C. J., Walling, Simpson, Kephart, Schaffer, Maxey and Drew, JJ.

*Robert D. Dalzell,* of *Dalzell, Dalzell & McFall,* for appellant.—There was contributory negligence: Minnich v. Traction Co., 267 Pa. 200; Dryden v. R. R., 211 Pa. 620; Kunkle v. Lancaster Co., 219 Pa. 52; Dunlap v. Traction Co., 248 Pa. 130; Martin v. R. R., 265 Pa. 282; Hill v. Traction Co., 271 Pa. 232.

There was not sufficient evidence of negligence on the part of defendant to warrant a submission of the case to the jury: Cummings v. R. R., 301 Pa. 39; Grimes v. R. R., 289 Pa. 320.

*Ralph H. Frank,* with him *Edward O. Spotts, Jr.,* for appellee.—Defendant was negligent: Phila. & Reading Ry. v. Long, 75 Pa. 257; Bickel v. R. R., 217 Pa. 456; Mellon v. R. R., 282 Pa. 39; Cummings v. R. R., 301 Pa. 39.

Haller was not negligent: Johnson v. Hetrick, 300 Pa. 225; Wachsmith v. R. R., 233 Pa. 465; Jerko v. Ry., 275 Pa. 459; Nutt v. R. R., 281 Pa. 372; Wanner v. Ry., 261 Pa. 273; Senft v. Ry., 246 Pa. 446; Eline v. Ry., 262 Pa. 33; Loughrey v. R. R., 284 Pa. 267; Kilpatrick v. Transit Co., 290 Pa. 288; Minnich v. Traction Co., 267 Pa. 200.

OPINION BY MR. JUSTICE MAXEY, November 23, 1931:
In the Town of Natrona the defendant company operates a railroad running east and west. There are three

tracks, the northern, or westbound track; the middle, or eastbound track, on which the accident giving rise to this case occurred; and the southern, which is a siding. Philadelphia Avenue, 16 or 18 feet wide and running north and south, crosses these tracks. At about 3:30 p. m., January 12, 1929, one J. A. Wallace, with plaintiff's decedent, Carl Haller, in his car as a guest, drove his car south toward this crossing and stopped within 15 feet of the nearest rail of the first track, on which track a freight train was then moving west at the estimated speed of 40 or 50 miles an hour. After it passed, Wallace looked to the left and right and saw no approaching trains, and when the caboose of the freight train was 50 or 75 feet beyond him he started slowly over the crossing. When he got on the first track he saw a truck on the other side. The truck driver gave him a signal which Wallace interpreted as a signal to stop. Wallace then stopped on the westbound track. He next heard behind him the siren of a fire truck. He pulled over to the right and forward to make room for the fire truck to pass. In doing so his front wheels got on the second or eastbound track. He stopped his car, with the motor running. Just as he turned his head to see the fire truck coming behind him he heard Haller cry "train," and just at that instant an eastbound passenger train hit his car, fatally injuring Haller.

There were no safety gates, crossing watchman, alarm bell or safety lights at this crossing. There was a sign reading, "Stop, Look and Listen." The following questions were addressed to Wallace and answers were made by him at the trial. "Q. At the time you stopped on Vine Street waiting for the freight to go by......did you hear the train whistle? A. No. Q. Did you listen for a whistle? A. I don't know as I listened for a whistle at that time; I don't think so, because I was out of danger." He was then asked whether or not when he was on the westbound track he looked to his right

[whence came the passenger train]. He answered: "No, I do not think I did, not after I got over there."

John Borowski, a witness for plaintiff, testified that he saw the passenger train before it struck the automobile, that it was then about 150 feet away from the crossing. He was asked if he heard any whistle. He answered: "No." After testifying that he had been driving automobiles for five years [for the purpose of qualifying himself as a judge of speed] he was asked: "Are you able to estimate for us how fast the passenger train was moving at the moment that it hit Mr. Wallace's car?" He answered: "I judge it was moving about 30 miles an hour when it hit his car." He said when he first saw it 150 feet from the crossing it was running 40 miles an hour. He testified that he did not hear any whistle sounded or bell rung on the passenger train "until it was on top of the machine." He was not asked if he had listened for warning signals.

A woman testified that she lived 45 feet west of the crossing, that she was in the kitchen, that she heard a shrill whistle, two whistles, that she left the kitchen, went through the dining room, through the parlor, to the living room window, and that by the time she got there the machine was hit. After these and an unimportant witness testified, plaintiff rested. A motion for a compulsory nonsuit was made and denied.

Numerous witnesses called for defendant gave positive testimony that the locomotive of the passenger train whistled at the whistling board for the crossing, that after the passenger train passed the freight train a second alarm was sounded for the road crossing, and that this consisted of two long and two short blasts and the bell was also ringing.

The engineer testified that he saw Wallace's car when he was 75 feet away from it, that he applied the emergency brakes, that as he did so the passenger train was not running more than 20 miles an hour, and that the train was running on time and at the usual speed at

that point. The train was scheduled to stop at Natrona, 600 feet east of this crossing.

Plaintiff's proof of negligence accepted at its face value amounts to this: The passenger train was approaching an unprotected crossing in a town at the estimated rate of 40 miles an hour. Two men did not hear a warning whistle or bell. One of these two men frankly said he was not listening for signals and the other was silent as to whether he was listening or not. This evidence falls so far short of proving negligence as to make its submission to a jury unwarranted. The absence of a flagman or safety gates at a crossing is not sufficient to charge a railroad company with negligence, unless there is evidence showing exceptional danger at that point: Cummings v. P. R. R., 301 Pa. 39.

A speed of 40 miles an hour is not sufficient by itself or when associated with any fact or facts present in this case to support a finding of negligence. Before the question of speed at a crossing can be submitted to a jury, it must be in evidence that the speed testified to was greater than was usual at that place or that special circumstances existed there at that time and were known or should have been known to the defendant or its servants which rendered necessary a lower speed at that point. This court, in Childs v. P. R. R., 150 Pa. 73, held that a rate of speed of 53 miles an hour at a crossing in a rural portion of a city did not give rise to a finding of negligence, saying: "The right of a railroad to move its trains at such rate as the necessities of its business, or the requirements of the public may make necessary is subject only to such restrictions as may be found necessary in cities and populous towns. In the crowded centers of business and population the public safety requires the speed to be moderated, but in the open country the single traveler over the wagon road may, under all ordinary circumstances, provide for his safety by compliance with the rule of law and of common sense that requires him to stop, look each way along

the track and to listen for an approaching train before attempting to cross the track. The movement of trains must be regulated by the railroad companies in the exercise of a business discretion, and upon consideration of the competition they have to encounter and the necessities of modern business." While in the case before us the crossing is in the built up section of a township, the principle laid down in the case just cited applies. In the first place, the distinction between a crossing in a built up section and in "rural portions" is in these days not so marked, for several reasons, first, since the advent and extensive use of automobiles, railroad crossings in rural sections are probably traversed as frequently or nearly as frequently as in built up sections. If railroads must, in order to escape the charge of negligence, moderate the speed of their trains to less than 40 miles an hour at every crossing where vehicles are likely to pass frequently, there would be few if any railroad crossings where this slackening of speed would not be required, and yet such a rule would be inconsistent with the requirements of modern transportation.

Second, until the last twenty-five years practically all vehicles crossing railroad tracks were horse-drawn or ox-drawn. Vehicles so drawn were not able to move at more than 30% of the possible speed of the average present day automobiles. Since a railroad company is bound to regulate the running of its trains so as to make it possible for a driver to cross the tracks in safety if he has stopped, looked and listened at the proper place (Schwarz v. D., L. & W. R. R., 211 Pa. 625), the speed at which a train would approach an unprotected crossing traversed by the customary slow moving vehicles of twenty-five years ago would, in the interest of public safety, have to be less than the speed of a train approaching a crossing traversed by fast moving automobiles. Since a railroad crossing of three tracks is no more than 30 or 35 feet in width from a point of safety on one side to a point of safety on the other side, an automobile that

has been stopped at one side of the crossing can easily be driven sufficiently fast across the tracks to get out of the zone of danger in a few seconds. If the driver of the car in which plaintiff's decedent was a passenger had the patience to wait at least 5 or 10 feet from the westbound track—as it was his duty to do—until the passing freight traveling at 40 or 50 miles an hour had proceeded west 1,250 or 1,500 feet, he would have had a clear view of the eastbound track for that distance. If the passenger train was then in sight, he should have prudently waited until it had passed him. If it was not in sight, he could easily have crossed to a point of safety on the other side of the tracks, for it would have taken a passenger train traveling at forty miles an hour twenty seconds to travel 1,250 feet to the railroad crossing where plaintiff's decedent was struck. The driver's loitering on the track on account of the fire truck in no way increased the defendant's duty to him or his guest as the defendant's engineer had no reason to anticipate that anybody would loiter on the tracks.

Third, people have now become more accustomed to high speed than were the people of the last century and have learned to accommodate themselves to it. Statutes and judicial decisions always take account of profoundly changed conditions of living. The conforming of statutes to changed conditions is illustrated in the changes in motor codes in recent years. Under the most recent code of this Commonwealth, one may lawfully drive an automobile on the ordinary highways of the State, except in certain areas and under certain conditions and restrictions and having due regard for the traffic, etc., at a speed of 40 miles an hour, whereas under the Motor Code of 1903 the maximum permissible speed was 8 miles an hour within city and borough limits and 20 miles an hour elsewhere. A person about to cross a highway even in rural sections is likely to find a car darting across his path at a lawful speed of 40 miles an hour. If the running of an automobile on rural

roads at 40 miles an hour is not, except under circumstances where it is forbidden, prima facie negligence, the running of a railroad train 40 miles an hour over a crossing even in the built up section of a township such as in the case now before us, does not support an inference of negligence unless it is unusual speed for trains at that crossing or unless some condition is present there and actually or constructively known to the defendant or its servants which makes such speed negligence, or unless a view of the railroad in either direction, sufficient to enable a careful person to cross in safety, is blocked by houses, standing railroad cars or other nonmoving or slow moving obstructions. In the case before us all that blocked a quarter of a mile view of the road toward the west, whence came the passenger train, was a westbound freight train going at a rate of speed which would have taken it a quarter of a mile west of the crossing in a third of a minute. It was the driver's duty to wait until that freight train had cleared his western view sufficiently for him to so regulate the driving of his car as not to stop it in front of a near-by approaching passenger train. An ordinary regard for one's personal safety should have suggested that. The defendant cannot be held liable for an act of its engineer which would have caused no injury to a person exercising common prudence. The engineer of the passenger train had a right to assume that no driver of a car would do what the driver did in the present case. At this particular crossing, it was proved that the driver of the car would on Philadelphia Avenue at any point 5 feet of the northern rail of the eastbound track have had (after the freight train had gone far enough away) a clear view for 1,235 feet; at 10 feet, for 1,300 feet; at 15 feet, for 1,574 feet; at 20 feet, for 1,574 feet; and at 25 feet, for 2,154 feet.

The court below in its opinion discharging the rule for judgment n. o. v. refers to the fact that the "noise of a long freight train passing in the opposite direction

from which the passenger train was approaching, to some extent may have drowned the passenger train's signals and thus made the situation more hazardous." We hold that the freight train did not make the situation more hazardous if Wallace had exercised such ordinary prudence as both the law and elementary caution demanded. The passing freight train did not add anything to defendant's duty under the circumstances. It added only to the duty of those about to traverse the railroad crossing. It is a frequent occurrence for trains going in opposite directions to pass each other at or near railroad crossings, both in built up sections and in rural sections. The most primitive vigilance constrains persons not to drive onto a double track railroad crossing immediately after one train has passed and before that train has gone a sufficient distance to clear the view so that they can have reasonable assurance that they can cross the tracks in safety. In the absence of special circumstances other than the passing of a train in the opposite direction and the fact that the crossing in question is in a built up section of a township, and in the absence of proof that the speed of the train which caused the fatal injury was an unusual speed at that point, it cannot be held that a speed of 40 miles an hour over the crossing in question fairly gives rise to an inference of negligence. In fact, there is no reasonable ground for the inference that had the passenger train been running at the moderate speed of 20 miles an hour (as the engineer testified it was running) the collision would have been avoided, for the automobile in which plaintiff's decedent was a passenger was standing still on the track.

The bewilderment caused Wallace by the truck, the signal, and the siren would be facts for consideration on the question of Wallace's contributory negligence, but it is immaterial on the question of defendant's negligence. The engineer of the passenger train had neither actual nor constructive knowledge that the driver of an auto-

mobile would be found bewildered at that crossing. If he had such knowledge and had ample time to act upon it, it would of course have been his duty not only to slacken his speed but, if necessary to the saving of life, to stop his train, but he had no knowledge of Wallace's bewilderment or any reasonable grounds to anticipate it. He had a right to proceed at his customary speed to this crossing and to act upon the belief that no person would attempt to drive over it until he had availed himself of the opportunity which with a little patience would have been his to observe whether or not there was an oncoming train.

This court, in Newhard v. P. R. R. Co., 153 Pa. 417, cited with approval the following language from the case of Telfer v. Northern R. R. Co., 30 N. J. L. 188: "To hold that railway trains must run at such rates as to enable them to avoid collisions by stopping the trains at the approach of ordinary vehicles to crossings, would deprive them of that upon which their usefulness and value almost entirely depend."

The decisions in the cases cited by the appellee are not inconsistent with the conclusion we have reached in this case. In Phila. & Reading R. R. Co. v. Long, 75 Pa. 257, the victim was a child only twenty-five months old and the railroad on which the child was killed ran along [not merely across] a narrow public street, where, as this court said, "many persons of all ages, sexes and condition are constantly passing and repassing...... It was, therefore, clearly the province of the jury to ascertain from the evidence the true position of the child while the train was moving up Cresson Street, when and how far the engineer ought to have seen the child...... and whether he was keeping a due lookout, and a properly regulated rate of speed, in traversing a populous street."

The following three cases cited by appellee differ from the case now before us, as follows:

In Jerko v. Buffalo R. & Pbg. Ry. Co., 275 Pa. 459, there was a sharp curve of the railroad track south of the crossing from which direction the engine in question approached and a train approaching thereon could be seen only 330 feet from the usual and proper place for stopping by a person about to cross the track from the east side (this being the side from which the conveyance which was struck approached the crossing), and in that case it was testified to in behalf of the plaintiff by witnesses who said they listened for signals that the engine came onto the street at 30 miles an hour without giving warning of its approach by bell, whistle or otherwise.

In Mellon v. Lehigh Valley R. R. Co., 282 Pa. 39, the driver of the taxicab that was struck testified positively that no crossing signal was given by the locomotive and the plaintiff testified that the whistle blew only once and that was when the engine was 1,200 feet away. These two witnesses testified they listened for signals.

In Loughrey v. P. R. R. Co., 284 Pa. 267, plaintiff's witnesses testified that there was no adequate warning by bell or whistle. This court said in that case there was "much conflict in the evidence as to signals."

Bickel v. P. R. R. Co., 217 Pa. 456, also differs from the case now before us. In that case Justice MESTREZAT said in his opinion "it [defendant's negligence] was made to turn upon the question whether the whistle was blown at the whistle post and the fireman rang the bell at the crossing at which the deceased was killed." It was said further that for the trial judge to instruct the jury that they should believe the testimony of the engineer (as to signals) and disregard all the other testimony in the case as to whether the signal was given at the post or not, would be manifest error.

A train approaching a public crossing must give adequate warning. The burden of proving inadequacy of warning is on the plaintiff. If the plaintiff had offered positive evidence that no adequate warning had been

given, the present case would have been one for submission to the jury upon that question; but the testimony offered on behalf of the plaintiff on this point was entirely of a negative character, amounts to no more than a scintilla and falls far short of the burden of proof borne by the plaintiff. The case now before us is ruled on this point by the case of Knox v. Phila. & Reading Ry. Co., 202 Pa. 504. There the court said: "The only witness to show that no whistle was blown or bell was rung was [a man] who said: '......I did not hear any whistle until the one I spoke of when the crash occurred ......' He was contradicted by the engineer, fireman, conductor and brakeman. Here again we have the case of a passenger whose attention was not directed to signals, and yet might well say that he heard none." The court characterized such evidence as "a scintilla, and not sufficient to justify a charge of negligence." This court, in Grimes v. P. R. R., 289 Pa. 320, speaking through Mr. Justice Sadler, said: "The legal rule stated has been frequently recognized and applied in this State, and it has been uniformly held that where the evidence to establish lack of proper care is negative only, it is overcome by the positive evidence to the contrary, though the latter comes from the mouths of defendant's witnesses, and, under such circumstances, the question is not one for the jury to pass upon, where the physical facts corroborate their testimony (Anspach v. R. R., 225 Pa. 528; Keiser v. R. R., 212 Pa. 409; Knox v. R. R., 202 Pa. 504; Zotter v. Lehigh Valley R. R. Co., 280 Pa. 14), which simply means that, under such circumstances the negative testimony, being controverted, does not amount to more than a scintilla, and therefore cannot prevail to establish an essential fact."

That Wallace was guilty of contributory negligence in not waiting before going on the tracks, long enough for the end of the vision-obstructing freight train to go more than 50 or 75 feet, and in traveling onto the eastbound track and stopping there without even looking to the

west, where on the eastbound track the passenger train was approaching, is too plain to require discussion. Even the alleged distracting influence of the trucks cannot excuse such unwarranted disregard of the dictates of elementary caution. Whether or not Wallace's negligence can be imputed to his guest, Haller, or whether or not Haller himself was negligent in not attempting to escape from the peril in which Wallace's recklessness placed him, we do not here discuss, further than to say that a passenger in an automobile which is about to cross a railroad where the view is obstructed or which has stopped on a railroad crossing cannot, without subjecting himself to a well founded charge of negligence, be inert in the face of an obvious jeopardy from which he can escape by ordinary mental alertness and reasonably prompt action.

Plaintiff fell far short of offering evidence sufficient to warrant submitting to the jury the question of whether or not the engineer ran the train over the crossing at a speed which amounted to negligence, or on the question of whether or not adequate signals had been given. Therefore it is not necessary to decide the question of Haller's contributory negligence.

The judgment of the court below is reversed and judgment is here entered for defendant non obstante veredicto.