Mathis, Appellant, *v.* Lukens Steel Company.

Argued January 8, 1964. Before MUSMANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

*G. Clinton Fogwell, Jr.,* with him *Melva L. Mueller,* and *Reilly and Fogwell,* for appellant.

*Joseph F. Harvey,* with him *MacElree, Platt, Marrone & Harvey,* for appellee.

OPINION BY MR. JUSTICE MUSMANNO, June 1, 1964:

The Kulzer Company, an independent contractor roofing and metal concern, operating in Chester County, contracted with the Lukens Steel Company, to install on the roof of a building of the steel company, known as the Sodium Hydrate Building in Coatesville, two ventilators, each weighing some 400 pounds. Wallace Mathis, an employee of Kulzer, and the plaintiff in this case, was designated as foreman of the job. On the morning of April 9, 1957, he arrived at the plant of the steel company between 8 and 8:30 o'clock where he was met by a Kenneth Buffington, the defendant's maintenance coordinator, who made all the arrangements to have Mathis and his materials come into the plant, and pointed out to him the places on the ridge of the roof where the ventilators were to be installed. There can be no doubt that while Wallace Mathis was on the defendant's property the morning of April 9, 1957, he was there as a business visitor and that the Lukens Steel Company owed him the duty of reasonable care to make its premises safe for him and to give him adequate warning of any dangers known to it and unknown to Mathis.[1]

The aforementioned ventilators were to be hoisted to the top of the Sodium Hydrate Building, the eaves of which were 39 feet above the ground. From the eaves the roof on both sides sloped inwardly to a peak or ridge, the slope measuring 6 inches to the foot. About a foot inside the eaves, on the north slope of the roof, rose a series of 14 poles or wire towers, each 12

---

[1] *Giannone v. U. S. Steel Corporation,* 238 F. 2d 544.

feet 8 inches high, and each bearing two cross arms, the higher one holding in place three wires.

On the morning indicated, Mathis, by means of rungs attached to the poles for climbing purposes, ascended to the top of one of the poles for the purpose of suspending from one of the arms a block and tackle to be used in lifting materials for the ultimate installation, to perform which, he was on the defendant's premises. He held in his hands two ropes. He succeeded in tying one of them around the upper cross arm and was about to fasten the other rope close by, when there shot through his body 13,200 volts of electricity.

He brought suit in trespass against the Steel Company because of his resulting injuries and at the ensuing trial the jury returned a verdict in favor of the defendant. The plaintiff seeks a new trial, alleging certain trial errors. In his charge, the trial judge instructed the jury that if they found that Mathis was a trespasser at the time of the accident the defendant company owed him no duty of care save, of course, that of refraining from inflicting upon him any willful or wanton injury.[2] The plaintiff urges this instruction as error.

The trial judge in support of his instruction cites ¡Porreca v. Atlantic Refining Co., 403 Pa. 171, 174, where this Court said: " 'One who is invited or permitted to enter a particular part of the land becomes a trespasser if he enters another part of the land . . .': Restatement, Torts, section 341, comment (b). '. . . a license does not extend beyond the area to which the permission applies'."

But at the time of the accident in this case, Mathis had not entered "another part" of the defendant's land, or had he gone into an area beyond that to which he

---

[2] The judge did not specifically add this exception, but it is fundamental law.

had been invited by the defendant. When Mathis was hit by the lightning bolts which shot from the wires, he was working in the explicit area in which he was to perform his duties. He was on land to which he had been brought by the defendant's own employee. He was engaged in the very task he had come to fulfill, under some supervision of the defendant company.

In *Cooper v. Heintz,* 385 Pa. 296, the plaintiff was struck also by 13,200 volts of electricity when his body came into the proximity of conveyors of electricity emerging from a transmission tower under the control of the defendant. It was urged there, as here, that the plaintiff had no need to go to the roof of the transformer house and had he not done so, he would not have been injured. This Court said: "The defendant argues that there was no need for the plaintiff to go to the roof. The plaintiff was a seasoned structural iron worker and has explained why he made the trip in question. In the face of this explanation, which was fortified by other circumstances and accepted by the jury as reasonable, one cannot arbitrarily conclude that Cooper ascended to the roof for the purpose of obtaining fresh air . . . When a workman in the discharge of his duties proceeds from a place where it is necessary for him to be to another place where it is necessary for him to go, the law will not proclaim him guilty of contributory negligence *if he moves over a route unknown to him in the exercise of his normal faculties, to be dangerous.*" (Emphasis supplied)

In the case at bar the plaintiff was a mechanic of many years experience. He testified that in 1952 he had worked on the roof of this very building. Two other Kulzer employees testified to having worked on the identical roof four or five years before, and one of them specified that he had hauled materials to the roof in approximately the same manner Mathis had attempted the operation. During one of these previous

jobs the block and tackle attachment had remained on the crossbar for some four weeks, so that the defendant could not help but know of the practice. The evidence on this point on the plaintiff's side was not without contradiction, but the general picture which was created, negatived entirely any reasonable inference that the plaintiff, while engaged as a professional mechanic on this particular job, was a transgressor on the defendant's property, or was ever so regarded by anyone.

No evidence was presented which could justify a reasonable conclusion that Mathis conducted himself as a trespasser. So long as a worker does not intentionally stray from the locus in quo of his assigned task and continues to employ his faculties and strength in the reasonable completion of that task, he may not be characterized a trespasser. A worker who dutifully attends to his job with his eyes always on the accomplishment of his mission may not be branded a trespasser if, in the fulfillment of his responsibilities, he errs in judgment.

So long as the worker does not undertake an excursion of his own or skylarks away on some sudden self-generated whimsy, he cannot be regarded as an alien in the very realm of his occupational commitment. If, for instance, while Mathis was on the roof of the defendant's building, he had suddenly decided to engage in a kite-flying diversion or had set off on an exploration in the eaves for birds' nests, it could properly be argued that he had abandoned, at least temporarily, the purpose for which he was legally on the defendant's premises and the jury could determine from the facts if from a business visitor he had metamorphosed himself into a trespasser. But to say that a workman, without deviation from his main task, and while doing the very job for which he was invited to be on the defendant's premises, and without going be-

yond the physical limits of the area to which he has
been invited, may become a trespasser is not only fac-
tually unrealistic in projection, but legally wrong.
When the trial judge thus injected into his charge the
proposition of trespass without any substance to sup-
port it, he rang a bell of misinstruction, whose dis-
cordant notes could not but have confused the jury
as to the true issues in the lawsuit.

In argumentative reinforcement of its position on
trespass the defendant summons as precedents the
cases of *Prokop v. Becker,* 345 Pa. 607, *Porreca v. At-
lantic Refining Co.,* 403 Pa. 171, and *Dumanski v. City
of Erie,* 348 Pa. 505. So far as authority for this case
is concerned, these decisions melt away like the fog
of irrelevancy before the sunshine of the facts which
illuminate them in the State Reports. In *Prokop v.
Becker,* the child-plaintiff was struck by the landing
gear of an airplane while the child was at a place
which the defendant-owner of the land had established
as off-limits. Nor was there any evidence, as claimed
by the plaintiffs, to establish the locus in quo as a
playground.

In *Porreca v. Atlantic Refining Co.,* the plaintiff
was to pick up a shipment of motor oil at the defend-
ant's place of business. When he arrived there, he
did not go to any of the installations where the oil
could be obtained. Instead, he circled a garage build-
ing and entered into it, without the defendant's con-
sent, to obtain a wrench. While there he fell into a
lubrication pit.

In *Dumanski v. Erie,* 348 Pa. 505, two boys had
taken, in a small wagon, refuse to the city dump.
After disposing of the waste they departed from the
path which was used by trucks in going to and from
the dump and entered into a cave of cinders where
they had intended to gather bits of coal. Here the
accident occurred. The City did not know, or had no
way of knowing, that the boys would enter this cave.

Since the plaintiff here was on the defendant's premises as a result of its express invitation, the defendant was in duty bound to use reasonable care for his safety. *Sorrentino v. Graziano,* 341 Pa. 113. Since the defendant knew of the great danger attendant upon proximity to its high tension electric lines, it had the duty to bring home to the plaintiff knowledge of this deadly peril. *Cooper v. Heintz,* supra. The defendant says that it did warn the plaintiff and produced witnesses who testified to the presence of warning signs on the wire towers. It argues that the plaintiff could not help but see these signs and goes further with an assertion that since the plaintiff did not deny the existence of the signs, he in effect admitted their existence and posting. The plaintiff testified that he did not see such signs. It is not logical to maintain, as the defendant here insists, that the plaintiff's statement he did not see the sign, when he was in a position to see it if it existed, is not a positive refutation of the statement that the sign was there.

The defendant's employee Buffington testified that when the plaintiff was in the hospital, he overheard Mathis' immediate supervisor, a man named Travis, say to Mathis: "Didn't I warn you last night when I gave you instructions for the job about the dangers on the tower?" To this remark, according to Buffington, Mathis merely replied that Travis had talked to him, but he in no way admitted the correctness of Travis' remarks or recollection. From this wholly noncommittal reply, the trial judge assumed that somehow Mathis was charged, through Travis, with knowledge of the 13,200-volt danger of the wire towers. In charging the jury, the trial judge said: "If you credit that, if you find that to be true then there becomes involved here another principle of law to which I will refer."

What was there to be found true as the result of this ambiguous, unilateral, unended conversation?

Standing on this shaky premise, the trial judge then charged the jury: "Where the independent contractor either has been warned or in fact knows of his own knowledge that the dangerous condition exists, and the defendant says to you as a matter of law if you find that the Kulzer Company through its field representative, Mr. Travis, knew of the existing dangers, the condition of the high tension wires on this pole, that there was no duty upon Lukens Steel Company to notify Mathis himself of the danger because the law does not require the land owner to notify every workman employed by the independent contractor if the independent contractor is notified or if he in fact knows and they say you should find that the Kulzer Company did because Travis knew it and Mr. Buffington said that Mr. Travis talked to Mr. Mathis after the accident and Mathis said I know you did, and under those circumstances there is no breach of duty because the duty to warn has been waived because the Kulzer Company through Travis actually knew it and, therefore, if you find that to be the case there can be no recovery by this plaintiff."

This portion of the charge was erroneous.

The trial judge states that he based his charge to the jury, on this subject, on the authority of *Engle v. Reider*, 366 Pa. 411. The state of the law in this field perhaps needs some expository comment. In *Valles v. Peoples Pittsburgh Trust Co.*, 339 Pa. 33, two employees of an independent contractor were injured when pipes in the basement of the defendant's building broke, releasing ammonia gas. One of the workmen died. The survivor and the estate of the deceased brought suit against the building owner. It was brought out on cross-examination that the superintendent of the building had informed the contractor of the danger lurking in the pipes. The contractor did not take the stand to deny this assertion. This Court re-

versed the verdicts which had been returned in favor of the plaintiffs, and said that the plaintiffs failed in their case by not having the contractor testify that he was not informed of the contents of the pipe and the dangers incident to breaking them. It was established in the case that the building owner neither had retained nor exercised any control over the work undertaken by the contractor. It was further shown that the pipes and equipment were not concealed and were in open view.

In his opinion in the *Valles* case, Justice LINN referred to an opinion written by Justice SIMPSON in the case of *Nettis v. Gen. Tire Co. of Phila.*, 317 Pa. 204, where he said that the authorities are "hopeless conflicting" as to the duty owed by the landlord to employees of an independent contractor.

However, Justice SIMPSON stated that the Pennsylvania rule was as follows: " 'The owner is not charged with the absolute duty of having the premises safe; his duty is discharged by the exercise of reasonable care. All the authorities agree that it is incumbent upon the owner of the premises upon which persons come by invitation, express or implied, to maintain such premises in a reasonably safe condition for the contemplated uses thereof and the purposes for which the invitation was extended.' . . . An owner of a building owes no statutory duty to the employee of a contractor, in order to guard against injury to the employee, to instruct him as to the dangers of the employment, or to give him a reasonably safe place in which to work. While the owner in such case is required to use reasonable care to guard the employees against injury, he will not be liable where causes of the injury intervened which he neither did nor could expect . . . 'An owner of a building is not liable for injuries to a servant or to a person lawfully upon his premises by reason of latent defects of which he was ignorant and which

could not have been discovered by the exercise of reasonable care and diligence.' . . . 'An occupier of premises owes to business invitees the affirmative duty of [exercising reasonable care in] keeping his premises reasonably safe, and of giving warning of any failure to maintain them in that condition.' "

We acknowledge this to be a good statement of the law and it was affirmed in the *Valles* case.

In *Engle v. Reider,* the landowner Reider employed a Routman to install an electric furnace adjacent to a hot water heater which gave off deadly fumes, of which fact Reider had knowledge. Routman warned one of his employees, Smith, of this danger and instructed him to turn off the gas while working in the vicinity of the heater. Smith repeated this instruction to his fellow-employee Engle and Engle replied: "Okay." Engle did not, however, turn off the gas as he went into the danger zone and succumbed to contact with the deadly carbon monoxide. In his charge to the jury, the judge instructed them that there was a burden of proof on the part of the plaintiff to show *"affirmatively"* that the landowner "did *not* notify the contractor." (Emphasis supplied) This Court affirmed the charge. We hereby repudiate it. The ruling implied in the charge would declare that if the injured person cannot show that the landowner did *not* notify the independent contractor of the danger on his property, the legal presumption would follow that the owner *did* notify the contractor. To place the burden of proof on a negative proposition of that sort on a person who in most cases cannot possibly know what transpired between two persons with whom he may not have had any contact whatsoever is a burden so excessive as to be unrealistic, unreasonable and unjust, and we hold that no such burden exists in the law. What was stated in *Engle* to the contrary is now overruled.

Only one other matter needs to be considered. At the trial the defendant objected to the introduction in

evidence of a statement allegedly made by the plaintiff at the time he was in the hospital. The statement was signed with an "X" which the plaintiff denied making. He said he did not read the statement at the time it was taken by a man named Noel who did not testify. When the plaintiff read the statement in court he said that generally its contents were correct but that it did, in some details, deviate from a true account of what occurred. From the state of the record as it comes to us, we do not find that there was error in admitting the statement, but we make no ruling as to its admissibility at the next trial, if further circumstances surrounding the taking of the statement are related.

Judgment reversed with a venire facias de novo.